UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re                                                    Chapter 7

CLAUDIO ELEAZAR OSORIO, *et al.*                         Case No. 11-17075-BKC-RAM
                                                         (Substantively Consolidated)

      Debtors.

_____/

SONEET KAPILA, CHAPTER 7                                 Adv. Pro. No. 13-1724
TRUSTEE,

      Plaintiff,

vs.

ESTEBAN EVELIO GOMEZ,

      Defendant.

_____/

**DEFENDANT ESTEBAN EVELIO GOMEZ'S REQUEST
FOR JUDICIAL NOTICE AND MOTION TO DISMISS TRUSTEE'S
COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS**

      Defendant Esteban Evelio Gomez ("Mr. Gomez" or the "Defendant"), by and through

undersigned counsel and pursuant to Fed. R. Civ. P. 12 (b)(1) and (6), as made applicable to this

adversary proceeding by Fed. R. Bankr. P. 7012, moves to dismiss each count of the *Complaint*

*to Avoid and Recover Fraudulent Transfers* [ECF# 1] (the "Complaint") filed by Soneet R.

Kapila as Chapter 7 trustee (the "Trustee") for the substantively consolidated estates of Claudio

Osorio and Amarilis Osorio (the "Osorios"), Innovida Holdings, LLC ("Innovida Holdings"),

Innovida Services, Inc. ("Services"), Innovida Southeast, LLC ("Southeast"), and Innovida

MRD, LLC ("MRD") (MRD, together with Innovida Holdings, Services, and Southeast, the

"Entity Debtors; " MRD, together with the Osorios, Innovida Holdings, Services and Southeast,

collectively, the "Debtors").  Mr. Gomez states in support thereof:

# I.  <u>INTRODUCTION</u>

With no facts to support his allegations, and buttressed with flimsy speculation and conjecture, the Trustee has cast his net one last time towards a target with an innocent, short-lived business association with Claudio Osorio: Mr. Esteban Evelio Gomez.  Mr. Gomez, a well-respected businessman with an impeccable record of honesty and fair dealing, amicably severed ties with Mr. Osorio before Mr. Osorio sabotaged a promising business plan, a lucrative technology and the potential for a lasting worldwide enterprise.  Now, over six years from the date that Mr. Gomez and Osorio went their separate ways, the Trustee seeks to recover $2,405,063.20 (the "Transferred Funds") allegedly transferred from Mr. Osorio to Mr. Gomez on April 25, 2007.[1]

Indeed, Mr. Gomez's professional association with Mr. Osorio lasted approximately one year.  According to the Complaint, Mr. Gomez was paid back the funds that he had invested over the course of that one year business relationship.[2]  The Trustee's Complaint half-heartedly attempts to breathe new life into the well-publicized story of Claudio Osorio's deception and the dramatic downfall of the Innovida enterprise in order to try to substantiate the creation of a new character in the story who has been noticeably absent, for good reason, from both the U.S. government's indictment of Mr. Osorio and the bankruptcy cases of the Debtors.

In the Complaint, the Trustee advances theories of constructive fraud (Counts II and III), actual fraud (Count I), and unjust enrichment (Count IV).[3]  However, the Complaint falls short

---

[1] Accepting the allegations of the Complaint as true, the Trustee had two years from March 17, 2011 to file suit against Mr. Gomez. The Trustee waited until just two months prior to the expiration of this deadline (which equates to approximately six years from April 25, 2007) to subpoena Mr. Gomez for an examination under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

[2] Mr. Gomez does not agree with the Trustee's allegations that Mr. Gomez was simply an investor, as opposed to a lender.

[3] In paragraph 11 of the Trustee's Complaint, the Trustee claims that the adversary proceeding brought against Mr. Gomez is brought pursuant to section 548 and 550 of the Bankruptcy Code.  Presumably, the Trustee erroneously

on every single count.  The Complaint is rife with references to the acknowledged guilt of Mr. Osorio, while it glosses over the specifics of those bad acts that are so carefully described by the U.S. government in its indictment.  The Complaint dredges up old litigation claims that are tangentially connected with the Osorios and their other business enterprises in an obvious effort to remind the Court of the character of Mr. Osorio (and presumably intended to contaminate Mr. Gomez and every person every associated with Mr. Osorio), but again sidles around the important questions of when those claims arose and whether they were ever adjudicated and eventually liquidated.  The Complaint acknowledges the substantive consolidation of the Debtors, yet fails to address whether any value was received by any of the Entity Debtors for the Transferred Funds or whether each and every of the Entity Debtors were insolvent at the time the Transferred Funds were allegedly transmitted to Mr. Gomez.  The Complaint makes numerous legal conclusions as to applicable badges of fraud, of which there are only two specifically identified in the counts, yet fails to adequately plead the supporting facts.

There is a reason Mr. Gomez was sued so late in the day in this case: the Trustee has no viable claims against Mr. Gomez.  The Trustee's Complaint suffers from a multitude of deficiencies as a result.  For these reasons and other reasons that are also fatal to the Trustee's claims in the Complaint, which are discussed in more detail below, the Complaint must be dismissed in its entirety.

## II.    REQUEST FOR JUDICIAL NOTICE

In addressing a motion to dismiss a complaint, a court may consider not only the complaint itself but also "other sources courts ordinarily examined when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and

---

cites to section 548 in paragraph 11 because every single count in the Complaint is based on a state law claim and/or section 544 of the Bankruptcy Code.

matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).  A court may take judicial notice of public records, including court filings.  *See Johnson v. First NLC Fin. Servs., LLC (In re NLC Fin. Servs., LLC)*, 410 B.R. 726, 729 (Bankr. S.D. Fla. 2008).  With respect to the exhibits offered in this Motion, Defendant offers the exhibits either on the basis that they were directly referenced in the Complaint or they are central to the plaintiff's claim and are undisputed.  *See In re Ginn-La St. Lucie Ltd., LLLP*, 08-29769-BKC-PGH, 2010 WL 8756756 (Bankr. S.D. Fla. Dec. 10, 2010) ("The Eleventh Circuit has also determined that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, a court may consider the document if it meets the centrality requirement imposed in *Horsely*.").   According to the court in *In re Ginn-La St. Lucie*, the Eleventh Circuit has determined that courts may consider documents 'attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Id.  See also Mukamel v. American Express Company (In re Arrow Air, Inc.)*, 10-28831-BKC-AJC, 2012 WL 6561313 (Bankr. S.D. Fla. Dec. 14, 2012) (taking judicial notice of the case dockets of the bankruptcy cases of the debtors).

Pursuant to Rule 201(d) of the Federal Rules of Evidence, which is applicable to this proceeding, Mr. Gomez respectfully requests that the Court take judicial notice of the documents included as exhibits to this Motion, as well as all matters of record from the Debtors' chapter 11 bankruptcy cases pending before this Court under substantively consolidated Case No. 11-17075-BKC-RAM and Case Nos. 11-17702-RAM, 11-17704-RAM, 11-17705-RAM, and 11-17706-RAM.

5333208-8

### III.   <u>FACTUAL BACKGROUND</u>

#### A.  THE CREATION OF COEG, LLC AND INNOVIDA HOLDINGS, INC.

COEG, LLC ("COEG") was formed on March 21, 2006 as a Florida limited liability company.  Complaint, ¶ 15.  COEG, Smartco, Inc. and Innovida Holdings, Inc. signed a Stockholder's Agreement (the "Stockholder's Agreement") on March 29, 2006.  Complaint, ¶ 22.  The Stockholder's Agreement provides that COEG and Smartco owned all of the issued and outstanding stock of Innovida Holdings, Inc. ("Inc.").  *Id.*  Thus, the ownership of COEG was split between Claudio and Mr. Gomez.  COEG, in turn, owned half of Inc. and Smartco owned the other half.

Mr. Gomez and Claudio Osorio created COEG and Innovida Holdings, Inc. to coordinate the production and manufacture of a type of resin panel used to construct buildings.  Complaint, ¶ 21.  For instance, the Innovida resin panels were used to create sleeping quarters for workers in Dubai and were also used to construct temporary worker facilities in Abu Dhabi.  *See Debtors' Disclosure Statement in Connection with Debtors' Third Amended Plan of Reorganization* (the "Disclosure Statement") [EC No. 370], Article V.[4]  According to the Complaint, "the purpose of incorporating COEG was to acquire intellectual property and technology ("***Intellectual Property***") for the manufacturing of fiber composite panels to be used to build residential, commercial, government, military, and globally relevant structures without use of cement, steel, or wood, and with significant savings in costs to build, time to build, and energy costs to operate."  Complaint, ¶ 19.  Claudio led the efforts on expanding the Innovida enterprise.  Disclosure Statement Article IV and V.

---

[4] The Complaint references this Court's *Order Denying Approval of Debtors' Disclosure Statement and Converting Cases* [ECF No. 393].

5333208-8

Unfortunately, the Complaint is full of gaping factual holes. However, by reference to other documents filed in the Debtors' chapter 11 case, as well as the documents specifically referenced in the Complaint, some of the holes can begin to be filled, and it becomes clear that the Trustee's claims against Mr. Gomez are implausible.

On June 19, 2006, COEG signed a promissory note payable to Mr. Gomez for $1 million (the "Gomez Note"). A true and correct copy of the Gomez Note is attached as **Exhibit "A."** On June 19, 2006, Innovida Holdings, Inc. signed a promissory note payable to COEG for $1 million (the "COEG Note") (the COEG Note, together with the Gomez Note are collectively referred to as the "Promissory Notes"). A true and correct copy of the COEG Note is attached as **Exhibit "B."** In the time leading up to the execution of the Promissory Notes and during the time following the execution of the Promissory Notes, Mr. Gomez and his wife, Lorena Gomez, made multiple wire transfers to or for the benefit of COEG to pay for certain expenses associated with the operation of the Innovida enterprise. Complaint, ¶ 35.

On or about April 25, 2007, Claudio and Mr. Gomez arranged for the transfer of Mr. Gomez's 50% interest in COEG to Claudio in connection with a sum of money and other consideration, including but not limited to a non-compete agreement and Mr. Gomez's relinquishment of any control or role in any other Innovida entity. Complaint, Exhibit B.

Without any facts to support its conclusory allegations, the Complaint alleges that Mr. Osorio was engaged in fraudulent activity on or about the time of this transfer. The Trustee relies on two documents to support this factually bereft contention – a complaint filed nearly 3 years after the transaction at issue in the Complaint by a company called Core Development Holdings Corporation (referred to by the Trustee in paragraphs 41 and following paragraphs of

6

the Complaint) and the indictment of Mr. Osorio.  Neither of these documents stands for what the Trustee suggests.

Approximately three years after Mr. Gomez terminated any involvement with the Innovida enterprise by transferring his 50% interest in COEG to Claudio, a company called Core Development Holdings Corporation sued the Osorios in the Eleventh Judicial Circuit in and for Miami-Dade County (Case No. 10-46330 CA 40) (the "Core Action").  A true and correct copy of the complaint (the "Core Complaint") is attached hereto as **Exhibit "C."**  In the Core Action, the plaintiff asserts that Core purchased a 30% interest in Innovida Inc. for $6,303,400.00.  Core Complaint, ¶ 16.  According to the Core Action, Innovida Inc. owned 100% of COEG and Innovida Holdings, Inc.  Core Complaint, ¶ 18.  However, the Core Complaint focuses on the Osorios' actions *after* Mr. Gomez was no longer in the picture.  For example, Core claims that between July and October of 2007, Claudio was restructuring the Innovida entities without Core's knowledge or consent.  Core Complaint, ¶ 27.

In December 2012, the United States indicted Mr. Osorio and Craig Toll for conspiracy to commit wire fraud, wire fraud, conspiracy to commit wire fraud, major fraud against the United States, false statements, conspiracy to commit money laundering, and forfeiture.  Mr. Gomez was not named in the Indictment, which is attached as Exhibit C to the Complaint, as either a defendant or as a participant in the scheme perpetuated by Claudio and Toll.  In fact, the predicate acts that form the basis of the wire fraud counts described in the Indictment *all* took place *after* Mr. Gomez exited the Innovida enterprise in April of 2007.  The specific incidents described in Count 10 (Conspiracy to Commit Wire Fraud) also *all* took place after Mr. Gomez exited the Innovida enterprise in April of 2007.

### B. THE DEBTORS' BANKRUPTCIES

On March 24, 2011, the Entity Debtors each filed a chapter 11 petition.  Complaint, ¶ 7.
On March 17, 2011, Claudio and Amarilis Osorio filed a joint chapter 11 petition.  Complaint, ¶
6.  On April 4, 2011, the Court entered its *Order Granting Receiver's Emergency Motion (1) to
Excuse Compliance with 11 U.S.C. § 543 and (2) to Appoint Trustee Pursuant to 11 U.S.C. §
1104* [ECF No. 46].  Shortly thereafter, the Office of the United States Trustee filed its Notice
appointing Mark Meland as the chapter 11 trustee for the Entity Debtors [ECF No. 48]. Prior to
the filing of the bankruptcy cases by the Osorios and the Entity Debtors, Mr. Meland was
appointed as a receiver in a state court litigation styled *Chris Korge v. Claudio Osorio, Amarilis
Osorio, Craig Toll and Innovida Holdings, LLC*, Case No. 10-51885-CA-32.  Complaint, ¶ 5.

On August 9, 2012, following the failure to approve a disclosure statement and confirm a
chapter 11 plan for the Debtors, the Bankruptcy Court ordered the conversion of the Debtors'
cases to chapter 7 and appointed Soneet Kapila as chapter 7 trustee.  Complaint, ¶ 8.  Following
the Trustee's appointment, the Bankruptcy Court –at the request of the Trustee--entered its
*Amended Order Granting Trustee's Motion to Substantively Consolidate Cases Pursuant to 11
U.S.C. 105* (the "Sub Con Order") [ECF No. 547].  Complaint, ¶ 10.

According to the Sub Con Order, the estates of the Osorios and the Entity Debtors were
substantively consolidated.  The Sub Con Order preserved all actual fraudulent transfer actions
held by any of the Innovida Debtors (i.e., the Entity Debtors) and all constructive fraudulent
transfer actions held by any of the Innovida Debtors with respect to any transfers made by any of
the Innovida Debtors for the benefit of either or both of the Osorios.  However, the Sub Con
Order expressly provides that "this provision [regarding substantive consolidation] is without
prejudice to any defendant to such a cause of action challenging the applicability of this aspect of
this Order as a defense to any claim brought by any party." Further, the Sub Con Order did <u>not</u>

8

preserve actual fraudulent and constructive fraudulent transfers held by the Osorios.   This omission is important because the Entity Debtors preserve their separate corporate character for the purposes of determining value received, insolvency, etc., while the inquiry with respect to the Osorios will necessarily incorporate the Entity Debtors because of the substantive consolidation.

## IV.  <u>STANDARD OF REVIEW</u>

In order to survive a motion to dismiss, a plaintiff must, "allege more than labels and conclusions; his complaint must include factual allegations adequate to raise a right to relief above the speculative level." *Financial Security Assur., Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1282 (11th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal quotations omitted)). However, a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly,* 550 U.S. at 555.  Where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 547.

The Supreme Court's holdings in *Twombly* and *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1951 (2009) can be distilled down to two mandates for a trial court considering a motion to dismiss under Rule 12(b)(6): "(1) the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice;" and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal,* at 1950 (citing *Twombly* 550 U.S. at 555).

As a result of the holdings in *Iqbal* and *Twombly,* the Trustee must assert factual allegations that show that relief is plausible, rather than plead in an ultimately conclusory fashion.  The well-pleaded facts cannot be "merely consistent with a defendant's liability" but

must demonstrate a "plausible entitlement to relief." *Iqbal,* 129 S. Ct. at 1949 (citing *Twombly,* 550 U.S. at 556-57).

The Trustee's threadbare allegations fail to meet this standard for all Counts asserted in the Complaint.

## V.  LEGAL ARGUMENT

### A. COUNTS I-IV SHOULD BE DISMISSED FOR FAILING TO MEET THE PLEADING STANDARDS SET FORTH IN *TWOMBLY* AND *IQBAL*

#### i.  The Trustee Fails To Allege That The Transferred Funds Were Property Of The Osorios

In the Complaint, the Trustee fails to adequately allege that the Transferred Funds were transfers of an interest of the debtor in property.  In order to avoid a transfer of property under sections 726.105(1)(a), 726.105(1)(b), and 726.106, the Trustee must establish that the Transferred Funds was a transfer of the Debtor(s)' interest in property.  In *Feltman v. Keybank, N.A. (In re Levitt and Sons, LLC)*, 2010 WL 153987 (Bankr. S.D. Fla. 2010), Judge Ray emphasized a plaintiff's obligation, even with the application of the more liberal pleading standard under Rule 8 of the Federal Rules of Civil Procedure, to identify with specificity the source entities of the allegedly fraudulent transfers.

For instance, the Trustee acknowledges that the Transferred Funds were sourced from multiple bank accounts allegedly associated with the Osorios, but does not attach a single bank statement, wire transfer record, or other financial statement showing: (a) the actual bank account associated with the transfer of the Transferred Funds, including any records clarifying whether the Osorios were the only persons listed on the particular account or whether the Osorios had more than one bank account at Royal Bank of Canada, Wells Fargo or Suntrust; or (b) the bank account or bank accounts that actually received the Transferred Funds.  If the Trustee believes he

is subject to a relaxed standard because of his position as a fiduciary, that position is unavailing. The Trustee and his advisors' have had unrestricted access to the financial records of the Debtors for over two years: first as counsel to the Receiver, next as counsel to the Chapter 11 Trustee for the entity Debtors, and finally as counsel to the Trustee. *See In re Ernie Haire Ford, Inc.*, 459 B.R. 824, 838 (Bankr. M.D. Fla. 2011) ("Having access to the Debtor's records, and armed with a method of identifying particular transactions as potentially fraudulent, Plaintiff has been able to identify specific transactions that he believes are actionable. Accordingly, Plaintiff must plead the details of these transactions and with the particularity required by Rule 9(b).").

Moreover, assuming for a moment that the allegations in the Complaint are true and that Mr. Osorio used money fraudulently obtained from Engin Yesil to purchase a 50% interest in COEG from Mr. Gomez, the Trustee has essentially pled that the money was <u>not</u> in fact property of the Osorios' estates. The Trustee's omissions and reliance on the Core Complaint result in the failure of the Trustee to allege facts supporting a claim that the Transferred Funds were property in which a debtor, that being Osorio, had an interest.

### ii. Count I Fails To State A Claim For Actual Fraud

With respect to allegations that the Transferred Funds were transferred with actual intent to hinder, delay or defraud under section 726.105(1)(a) of the Florida Statutes, Rule 9(b) of the Federal Rules of Civil Procedure requires that the specific circumstances constituting the actual fraud must be alleged with respect to each transfer. *See Mukamal v. American Express Co. (In re Arrow Air, Inc.)*, 10-28831-BKC-AJC, 2012 WL 6561313, at *3 (Bankr. S.D. Fla. Dec. 14, 2012) ("To sufficiently allege fraud, 'a party must state with particularity the circumstances constituting [the] fraud.' F.R. Civ. P. 9(b). Thus, a complaint must include allegations of 'facts

amounting to deception in one form or another.'")[5]; and *In re Ernie Haire Ford*, 459 B.R. at 840 ("Also, Plaintiff may assert the state law fraudulent transfer claims in counts I–III through § 544(b), with at least the actual fraud count being subject to the heightened pleading requirements of Rule 9(b).").

According to the court in *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 767 (Bankr. W.D. La. 2013), "[a] strong inference of fraudulent intent 'may be established either (a) by alleging <u>facts</u> to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging <u>facts</u> that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" (emphasis supplied). Nowhere in the Complaint does the Trustee sufficiently plead the Osorios' motive or "opportunity to commit fraud" with respect to the Transferred Funds. The Trustee simply remarks that Mr. Osorio pled guilty to two counts of conspiracy to commit wire fraud and one count of conspiracy to commit money laundering, all of which occurred well after the conduct in question, without reference to Mr. Osorio's intent as to the particular transaction giving rise to the transmission of the Transferred Funds. There is no plausible allegation explaining how Mr. Osorio's alleged payment to Mr. Gomez could lead to a reasonable inference of fraudulent conduct.

In similar cases where the only statement as to the transferor's intent is a regurgitation of the language of the applicable statute, courts have held that the intent element was not sufficiently alleged. *See Oginsky v. Paragon Properties of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1371 (S.D. Fla. 2011) ("The only allegation of Defendants' intent is: 'Paragon made the transfers to Defendants Judith Gale, Lisa Tashman, and Julien Siegel with the actual intent to

---

[5] "Because the elements to state a cause of action under section 548(a)(1)(A) of the Bankruptcy Code and Fla. Stat. § 726.105(1)(a) are similar, it is appropriate to simultaneously consider the facts alleged in the complaint…." *In re Arrow Air*, 2012 WL 6561313, at *4. By extension, if the elements are so similar so as to consider the same facts for a claim under section 548 and one under section 726.105(1)(a), the pleading requirements should also be the same with respect to the application of Rule 9 of the Federal Rules of Civil Procedure.

hinder, delay, or defraud Plaintiffs and members of the class from obtaining the monies Paragon owed them.' *Id.* This is the type of 'formulaic recitation of a cause of action's elements [that] will not do.'"). *See also In re Arrow Air, Inc.*, 10-28831-BKC-AJC, 2012 WL 6561313 (Bankr. S.D. Fla. Dec. 14, 2012) ("The mandate that a court must accept all allegations in a complaint as true for purposes of considering whether a claim should survive a motion to dismiss does not apply to legal conclusions….'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'").

Of course, a court may consider certain "badges of fraud"[6] (the second alternative under *Gulf Fleet*) in order to determine whether the Transferred Funds were transferred with the requisite intent.  The only badges of fraud put forth by the Trustee in Count I of the Complaint are: (1) "Mr. Gomez was an insider of the Osorios;" and (2) "the Osorios were insolvent." Complaint, ¶¶ 55-56.  Again, the Trustee fails to plead with sufficient specificity with respect to the allegation that Mr. Gomez was an "insider."   According to section 101 of the Bankruptcy Code, the term "insider" for an individual debtor includes a "(i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general

---

[6] Some of the factors that a court may consider are as follows:

    (a)   The transfer or obligation was to an insider.
    (b)   The debtor retained possession or control of the property transferred after the transfer.
    (c)   The transfer or obligation was disclosed or concealed.
    (d)   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
    (e)   The transfer was of substantially all the debtor's assets.
    (f)   The debtor absconded.
    (g)   The debtor removed or concealed assets.
    (h)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
    (i)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
    (j)   The transfer occurred shortly before or shortly after a substantial debt was incurred.
    (k)   The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2).

partner of the debtor; or (iv) the corporation of which the debtor is a director, officer, or personal in control." The Trustee does not assert that Mr. Gomez is a relative of either of the Osorios, that Mr. Gomez was a general partner of either of the Osorios, or that Mr. Gomez was related to a general partner of the Osorios. In fact, Mr. Gomez is none of these things to Mr. Osorio or Mr. Osorio's wife, Amarilis.

After the issues with pleading Mr. Gomez's status as an insider, the only remaining badge of fraud is purported insolvency. As the court in *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 767 (Bankr. W.D. La. 2013) noted, however, "[a] single badge of fraud is insufficient to establish intent…." Based on the facts pled in the Complaint and for reasons discussed in this Motion, the insolvency badge is implausible for a host of reasons that will be explained in more detail in this Motion, including but not limited to the Trustee's failure to factor approximately over $5 million allegedly given to Mr. Osorio shortly before Mr. Osorio allegedly purchased a 50% interest in COEG.

There are other significant issues with the way that the Trustee pleads Count I that amount to a failure to meet the requirements of Rule 9. For example, the Trustee acknowledges that the Transferred Funds consisted of transfers made from at least three different bank accounts at RBC, Suntrust and Wells Fargo, but the Trustee does not plead actual or constructive fraud as to each individual transfer. Rather, the Trustee lumps the transfers all together, assuming they all went to the same person, place and for the same purpose, and then generally refers to bank accounts apparently associated with the Osorios at each of the aforementioned banks. In the *Order Granting Motion to Dismiss With Leave to Amend* entered by this Court in *Goldberg v. Merrill Lynch & Co. et. al. (In re Jet Network, LLC)*, Adv. No. 10-2701-BKC-RAM (Bankr. S.D. Fla. November 24, 2010), the Chapter 7 Trustee, acting as plaintiff, was ordered to plead his

14

fraudulent conveyance count with greater specificity.  Among other data specific points, this Court ordered the plaintiff to provide the "specific Merrill Lynch entity which held the account and the account number."

Finally, the Trustee fails to plead actual fraud under Count I because he both raises and fails to reconcile a serious timing issue.  The Trustee latches onto a general paragraph in the Indictment that alludes to a possibility of Mr. Osorio's wrongful conduct taking place on or around March 2007, or around the same time that Mr. Gomez decided to and eventually effectuated the transfer of his 50% interest in COEG to Claudio.  Complaint, ¶ 49. However, the Trustee fails to sufficiently plead with the specificity required; the attachment and incorporation of the Indictment, which is full of specific date references for each bad act under each count that all took place after Mr. Gomez transferred his interest in COEG.  Thus, the Trustee's attempt to link Mr. Gomez to Mr. Osorio's bad acts and satisfy the actual fraud pleading requirements through the first option addressed in *In re Gulf Fleet* fails.

### iii.    Counts II And III Fail To Plead Facts Demonstrating Less Than Reasonably Equivalent Value

As the Trustee well knows, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Trustee "must allege facts sufficient to show the plausibility that…the debtor received 'less than a reasonably equivalent value' in exchange for such transfer." *Kapila v. Bible Baptist College of Pennsylvania, Inc. (In re ATM Fin. Serv., LLC)*, 2011 WL 2604247, at *2 (Bankr. M.D. Fla. 2011).[7]   In *ATM Financial*, the court dismissed the amended complaint because of its complete failure to allege facts upon which the court could infer any value.  In fact, the court noted that it "could imagine a number of ways in which the transfer of $400,000

---

[7] Although the section of the Bankruptcy Code before the Court in *ATM Financial* was section 548(a)(1)(B), sections 726.105(1)(b) and 726.106(1) of the Florida Statutes also requires that the debtor receive less than "reasonably equivalent value" in exchange for the transfer(s).

*could have been* for less than reasonably equivalent value in exchange, but the scant factual information presented by the amended complaint makes none of those hypothetical scenarios plausible." *Id. See also Goldberg v. Merrill Lynch & Co. et. al. (In re Jet Network, LLC),* Adv. No. 10-2701-BKC-RAM, at *6 (Bankr. S.D. Fla. November 24, 2010) (Order Granting Motion to Dismiss With Leave to Amend) ("Plaintiff correctly notes that the Complaint must be judged under the pleading standards in Rule 8(a), Fed. R. Civ.P., applicable here under Fed.R.Bankr.P. 7008. Nevertheless, under the heightened standard set by the Supreme Court in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), the allegations are insufficient.").

This Court and Mr. Gomez ought not be compelled to use their respective imagination to consider how the transfer of approximately $2.4 million in satisfaction of antecedent debt and allegedly in exchange for a 50% interest in COEG and other consideration did not result in any reasonably equivalent value attributable to Mr. Osorio or any other of the Debtors. In fact, at first blush, there are at least three bases for the Court to infer that Mr. Osorio received substantial value for the 50% interest in COEG. First, the Trustee discloses the agreement between Mr. Osorio and Ulrich Schwartau to purchase Mr. Schwartau's Intellectual Property for $1 million in paragraph 21 of the Complaint, yet his only other factual allegation as to the value of the Intellectual Property is made as a passing afterthought. Specifically, the Complaint states that "(and the Intellectual Property belonging to Inc. had minimal, if any, value)." Complaint, ¶ 35. Conclusory statements as to reasonably equivalent value are insufficient under Rule 8 of the Federal Rules of Civil Procedure. *See In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 770 (Bankr. W.D. La. 2013) ("The allegations in the complaint with respect to the secured loan used to pay the $4 million loan are 'bare bones', and provide no details about the relationship between the secured loan and the repayment of the $4 million note, the nature of the collateral that secured

the loan, or the value of the collateral.").  Of course, if the Intellectual Property that Mr. Osorio arranged to purchase from Mr. Schwartau for $1,000,000.00 was valueless, it begs the question of why the Trustee had not sought to claw back that payment as well.

Second, the Trustee attaches the agreement resulting in, *inter alia,* the transfer of a 50% interest in COEG to Osorio, but he then totally fails to assign any value, even in the vaguest terms, to the other property and rights transferred in exchange for the Transferred Funds.  For example, the Membership Interest Agreement (attached as Exhibit B to the Complaint) (the "Agreement") and the documents executed in connection therewith provide for the extinguishment of debt, certain releases, a non-compete arrangement between Claudio and Mr. Gomez, Mr. Gomez's relinquishment of his positions or authority at a whole host of entities related to the Innovida enterprise, and so on and so forth.  The Trustee cannot attach these documents to the Complaint, cherry-pick the facts supporting the allegation that Mr. Osorio and Mr. Gomez entered into a business transaction, and then ignore the facts supporting the reasonably equivalent value of the transaction.

### a. Counts II And III Fail To Plead Facts Demonstrating Less Than Reasonably Equivalent Value With Respect To The Entity Debtors

The Trustee has ignored the substantive consolidation of the Osorios' estates with the estates of the Entity Debtors via the Sub Con Order. Thus, a critical inquiry is whether <u>any</u> of the Debtors received reasonably equivalent value in exchange for the Transferred Funds.  In *In re Pearlman*, 460 B.R. 306 (Bankr. M.D. Fla. 2011), the court addressed the consequences of substantive consolidation in a similar scenario.  The court stated that:

> The reason for dismissal is that, after consolidation, if *any* Debtor received fair consideration in exchange for a transfer made by *any other* joint Debtor, the consolidated estate is deemed to have received reasonably equivalent value in exchange for the transfer because the consolidated estate received a reduction in the

17

> principal amount and interest on the preexisting loan. In other words, after consolidation, the consolidated Debtors' estate benefits from repayments of preexisting loans made by *any* of the Debtor entities, and likewise *any* Debtor that made repayments of any loan obtained by another Debtor benefits from the reduced principal and interest on such loan.

*Id.* at 317. Counts II and III of the Complaint only address the Osorios, not any of the other Debtors.  While the Sub Con Order preserves certain fraudulent transfer claims held by the Entity Debtors, it did <u>not</u> preserve those claims held by the Osorios prior to the substantive consolidation.  The Trustee, therefore, must allege (with plausible facts) that none of the other joint debtors received any reasonably equivalent value in exchange for the alleged $2.4 million transfer.  The scant facts alleged do not support such a conclusion.  For example, the existence of and extinguishment of the COEG Note, demonstrates at $1 million reduction in the debt of Innovida Holdings, Inc., which later became Services.  Services is a substantively consolidated debtor, so the extinguishment of this debt in exchange for the Transferred Funds and the other consideration described in this Motion render the Trustee's allegations as to value received only with respect to the Osorios implausible.

>  v.     **Counts II And III Fail To Plead Facts Demonstrating The Osorios' Insolvency When The Transferred Funds Were Transferred**

Insolvency is an element of a claim under both sections 726.105(1)(b) and 726.106(1) of the Florida Statutes.[8]  While the Trustee cites the Core Complaint (attached as Exhibit C to this Motion) as a prime example of Mr. Osorio's misdeeds prior to the transfer of the Transferred

---

[8] Pursuant to section 726.105(1)(b), a plaintiff must plead that a debtor
> 1. [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> 2. [i]ntended to incur, or believed or reasonably should have believed that he or she
> would incur, debts beyond his or her ability to pay as they became due.

Similar, section 726.106(1) requires that a plaintiff plead that the "debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

Funds, the Trustee's reliance on the Core Complaint dooms his Complaint at the same time. According to the Trustee, approximately $5 million was transferred from Engin Yesil to the Osorios prior to the transfer of the Transferred Funds.  ¶ 38.  Yet, the Trustee mysteriously leaves this sum of money out of its assessment of the solvency of the Osorios at the time the Transferred Funds were allegedly sent to Mr. Gomez.  Simply put, it defies logic to sufficiently plead insolvency without addressing these significant funds, especially when insolvency is the only potentially viable badge of fraud after the insider status badge is obliterated.

Further, assuming the allegations of the Complaint are true and that Mr. Osorio received over $5 million from Engin Yesil, the Trustee has not pled facts showing how the transfer of the Transferred Funds (a sum approximately $3 million less than the Engin Yesil purported investment) rendered the Osorios insolvent.  The Trustee has also not pled any facts with regard to the Osorios' intent or knowledge in transferring the Transferred Funds, such that the Trustee has pled facts sufficient to support that the Osorios "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."  Fla Stat. § 726.105(1)(b)(2).

### a. Counts II And III Fail To Plead Facts Demonstrating The Entity Debtors' Insolvency When The Transferred Funds Were Transferred

Again, the Trustee fails to address the consequences of the Sub Con Order on the claims he has asserted against Mr. Gomez.  As stated previously, the Sub Con Order does not preserve or otherwise differentiate the fraudulent transfer claims the Osorios might hold from those held by the Entity Debtors.  Thus, there appears to be no basis upon which the Trustee can isolate the Osorios for purposes of establishing their insolvency or any value they received.  This is not a case in which the Debtors and the Osorios filed for bankruptcy almost immediately after the Transferred Funds were transmitted.  Further, the Trustee's Complaint only attempts to analyze

19

the liabilities of the Osorios (which on the date of the transfer were unliquidated, joint and several obligations of multiple persons or companies, or otherwise undefined for purposes of an insolvency allegation), as opposed to those of the Entity Debtors.  The Trustee's Complaint ignores the approximately $5 million allegedly received by Mr. Osorio in connection with Core when calculating the assets of the Osorios.

In another substantive consolidation case, the court in *In re Caremerica, Inc.*, 415 B.R. 200, 208 (Bankr. E.D.N.C. 2009) noted that "[m]issing from the complaint is an identification of the consideration received by each transferor, information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer.") (emphasis supplied).  Simply put, the Trustee fails to allege insolvency sufficiently for purposes of Rule 8 and sections 726.105(1)(b) and 726.106(1).

### vi.    Counts I, II And III Fail To Properly Allege The Existence Of An Actual Creditor

Counts I, II and III seek to assert fraudulent transfer claims pursuant to Fla. Stat. §§ 726.105(l)(a), 726.105(l)(b) and 726.106(1) under the "strong-arm" provisions of section 544 of the Bankruptcy Code. The source of the Trustee's ability to avoid certain transfers pursuant to section 544(b) stems from the concept that he is stepping into the shoes of an estate creditor. *See In re International Pharmacy & Discount II, Inc.* 443 F.3d 767 (11th Cir. 2005) ("Under 11 U.S.C. § 544(b), a trustee in bankruptcy may 'step into the shoes' of an unsecured creditor and void a transfer of an interest in the debtor's property that the unsecured creditor would have the power to void under federal or state law.").

To use this "strong-arm" power under section 544, the Trustee must identify this creditor. According to the Court in *In re Allou Distribution, Inc.,* 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008), "[s]ection 544(b)(1) requires a trustee to show *both* that there is an actual creditor as to whom the

20

transfer is 'voidable under applicable law,' *and that* the creditor 'hold[s] an unsecured claim that is allowable under section 502 of this title.' 11 U.S.C. § 544(b)(1)."  *See In re Denman,* 2008 WL 619173, at *2 (Bankr. M.D. Ala. 2008) ("The trustee bears the burden of proving the existence of a qualifying creditor, because without the creditor, the trustee is powerless to act under § 544(b)."); and *In re Scott Wetzel Servs., Inc.*, 293 B.R. 791, 794 (Bankr. M.D. Fla. 2003) ("Under 11 U.S.C. § 544(b), a condition precedent to a trustee's right to reach out and utilize a non-bankruptcy avoidance statute under applicable state law, is an allegation and ultimately proof of an existing creditor holding an unsecured claim that could have under applicable state law, attack the transfer in question.").

The Trustee does not identify any such creditor in the Complaint, much less offer a recital that such a qualifying creditor exists.  This glaring omission translates to a failure to satisfy the requirements of section 544.

### vii.    The Trustee Fails To State A Claim For Unjust Enrichment

Unjust enrichment is an equitable cause of action.  *See In re US Capital Holdings, LLC*, 12-14517-JKO, 2013 WL 5297352 (Bankr. S.D. Fla. Aug. 5, 2013).  The elements of an unjust enrichment cause of action are as follows: "(1) the plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff."  *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd*, 05-60055-CIV, 2011 WL 1232986 (S.D. Fla. Mar. 30, 2011) (citing *Peoples Nat. Bank of Commerce v. First Union Nat. Bank of Florida,* 667 So.2d 876 879 (Fla.Dist.Ct.App.1996)).  Importantly, "[t]he benefit conferred must be a direct benefit."  *Id.*

21

The Trustee falls flat on the third element.  The Trustee does not plead any facts as to the inequality of any or all of the Transferred Funds allegedly transferred to Mr. Gomez.  The Trustee's Complaint acknowledges that the transfer of a 50% interest occurred pursuant to a written, executed and otherwise fully negotiated agreement between Mr. Gomez and Osorio. Complaint, ¶¶ 30-32.  The Trustee does not dispute the validity of the agreement, but does not at all present any facts supporting the equity of keeping the Transferred Funds. According to this Court in an order entered on November 24, 2010 in *Goldberg v. Merrill Lynch & Co. et. al. (In re Jet Network, LLC)*, Adv. No. 10-2701-BKC-RAM, "if the plaintiff cannot prove a legal basis to set aside the alleged fraudulent transfers," how can it prevail on a theory of unjust enrichment? Mr. Gomez poses the same question to the Trustee and the Court.  Additionally, if one assumes the Trustee's allegation about Mr. Gomez receiving back his entire "investment" in an insolvent company is true, where is the inequity?

More importantly, however, the Trustee has pled himself right out of an unjust enrichment claim by not only asserting that Mr. Gomez was paid back every dollar that he advanced, but also by pointing to the agreement between Mr. Gomez and Mr. Osorio allegedly governing the Transferred Funds.  Under Florida law, the existence of a valid and enforceable contract governing the subject matter of the unjust enrichment bars such a claim.  *See, e.g., Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011) ("A party may only recover under an unjust enrichment theory when there is no valid express or implied-in-fact contract…. Finally, unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid."); and *Beary v. ING Life Ins. & Annuity Co.*, 520 F. Supp. 2d 356, 372 (D. Conn. 2007) (interpreting a contract for insurance governed by Florida law).  Nowhere in the

Complaint does the Trustee plead that the Agreement is invalid, void or otherwise unenforceable. For the foregoing reasons, the Court should dismiss the Trustee's unjust enrichment claim.

## VI.  CONCLUSION

The Complaint fails to allege the specific factual allegations necessary to sufficiently state a cause of action under in regard to Counts I, II, II and IV.  Therefore, Counts I, II, III and IV of the Complaint should be dismissed.

**WHEREFORE**, Defendant Esteban Evelio Gomez requests that the Court enter an order dismissing Counts I, II, III and IV of the Complaint, and granting such other and further relief as the Court deems proper.

Dated:  November 27, 2013.

Respectfully submitted,

BERGER SINGERMAN LLP
*Attorneys for Defendant Esteban Evelio Gomez*
1450 Brickell Avenue, Suite 1900
Miami, FL  33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340

By:   */s/ Paul Steven Singerman*
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Etan Mark
Florida Bar No. 720852
emark@bergersingerman.com
Alisa Paige Mason
Florida Bar No. 084461
pmason@bergersingerman.com

5333208-8

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on this 27th day of November, 2013, by electronic transmission through the Court's CM/ECF system upon all parties identified on the attached CM/ECF Service List.


　　　　　　　　　　　　　　　　　　　 _/s/ Alisa Paige Mason_　　　　　　　
　　　　　　　　　　　　　　　　　　　　　Alisa Paige Mason

### <u>CM/ECF SERVICE LIST</u>

Michael S Budwick, Esq on behalf of Plaintiff Soneet R. Kapila, Chapter 7 Trustee -
mbudwick@melandrussin.com, ltannenbaum@melandrussin.com; mrbnefs@yahoo.com

Daniel N Gonzalez, Esq on behalf of Plaintiff Soneet R. Kapila, Chapter 7 Trustee -
dgonzalez@melandrussin.com, ltannenbaum@melandrussin.com; mrbnefs@yahoo.com

5333208-8

# Exhibit A

PROMISSORY NOTE

U.S. $ 1,000,000                                                        Effective Date: **June 19**, 2006

  The undersigned, COEG LLC, a Florida limited liability company, with a mailing address of c/o Rozencwaig, Nadel & Ferrero-Carr, LLP 301 W. Hallandale Beach Boulevard, Hallandale Beach, Florida 33009 ("Payor"), hereby promises to pay to the order of Esteban Evello Gomez, with a mailing address of 871 North Venetian Drive, Miami, Florida 33139 ("Payee"), the principal sum of One Million Dollars ($1,000,000) in lawful money of the United States together with no interest thereon.

  A. Payments shall be due to Payee upon receipt by Payor of any payments as provided in the Stockholders' Agreement dated _____, 2006 for Innovida Holdings, Inc., a Florida corporation ("Innovida") and Payor's receipt of payment under that certain Promissory Note dated _____, 2006 (wherein Payor is the payee) from Innovida (as payor).

  B. This Note is prepayable without penalty in whole or in part, at any time with written notice to Payee.

  C. Upon the occurrence of any failure by Payor to comply with its payment or other material obligations hereunder, or at any time thereafter, at the option of Payee, Payor shall be in default hereunder and, unless such default has been cured within five (5) days after receipt of written notice (as provided herein) by Payor of such default, all of the obligations of Payor under this Note (including but not limited to the payment of all accrued and unpaid interest and the entire outstanding principal balance) shall become immediately due and payable, without further notice or demand by Payee. In addition, during any period of default hereunder which shall last beyond five (5) days following Payor's receipt from Payee of written notice specifying such default, the interest rate on the outstanding principal balance shall be eighteen percent (18%) (the "Default Interest"). The Default Interest shall begin to accrue on the aforementioned fifth (5th) day. Upon a default by Payor under this Note Payor shall in addition to all other amounts due under this Note pay, on demand, all costs of collection, and reasonable attorneys' fees and court costs paid or incurred by Payee, in enforcing this Note.

  D. Notwithstanding anything in this Note or in any related agreement to the contrary, it is not the intention of the parties to charge, nor shall there at any time be charged any interest (whether fixed, contingent, or otherwise) which would result in a rate of interest being charged which is in excess of the maximum rate permitted to be charged by applicable law; and in the event that any sum in excess of the maximum legal rate of interest is paid or charged, the same shall immediately upon discovery thereof, be deemed to have been a prepayment of principal as of the date of such receipt, and all payments made thereafter shall be appropriately reapplied to interest and principal to give effect to the maximum rate permitted by applicable law.

  E. Nothing in this Note shall prohibit Payee from transferring this Note to any successor(s) in interest, provided Payor consents to such transfer in writing. The provisions of this Note shall have the same force and effect with regard to any of said successor(s) in interest as they do with Payee.

  F. "Holder" shall mean Payee or any endorsee, assignee, or transferee of this Note who is in possession of it and entitled to payment in accordance with the preceding paragraphs.

  G. This Note shall be governed by the laws of the State of Florida without regard to its conflict of laws principles.

  H. Upon receipt of evidence reasonably satisfactory to Payor of the loss, theft, destruction or mutilation of this Note, and upon the prior written notice to Payee and the written confirmation from Payee of the loss, theft, destruction or mutilation of the Note and the receipt of indemnity or security reasonably satisfactory to Payor from the one claiming ownership hereof, or in the case of mutilation, upon surrender of the mutilated Note, thereupon Payor will make and deliver to such claimant a new Note of like tenor, in lieu of this Note.

  I. Except as otherwise provided in this Note, each maker, endorser, surety and guarantor of this Note hereby waives demand, presentment, protest, notice of dishonor, suit and any other condition precedent to action against such party for the collection hereof, and each severally agrees that, without notice to or consent of any such party, time of payment may be extended or a renewal note taken, or other indulgence granted, without the same releasing any such party from any liability hereunder.

CONFIDENTIAL                              GOMEZ001439

J.        No delay or omission on the part of Payee in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder. No waiver of any right shall be effective unless in writing signed by Payee, nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any other occasion.

K.        The term "Payee" shall also be defined to include any subsequent holders of this Note.

L.        Any notice, request, demand, offer, payment, or communication required or permitted to be given by any provision of this Note shall be deemed delivered and given for all purposes if written and if delivered personally or by courier or delivery service, at the time of such delivery or, if directed by registered or certified United States mail, postage and charge prepaid, addressed to the intended recipient, at the address specified in this Note, at such time that the intended recipient or its agent signs or executes the receipt. Either Payor or Payee may change the address to which notices are to be mailed to them by giving notice as provided herein to the other.

Payor has executed this Note this _____ day of _____, 2006.

Payor
COEG, LLC

By: _____
      Claudio Osorio, Manager

By: _____
      Evelio Gomez, Manager

F:\W\DATA\BENTATA\1674\DOCUMENTS\PROMISSORY NOTE COEG LLC.DOC

GOMEZ001440

# Exhibit B

PROMISSORY NOTE

U.S. $ 1,000,000                                     Effective Date: June 19, 2006

The undersigned, Innovida Holdings, Inc., Florida corporation, with a mailing address of c/o Rozencwaig, Nadel & Ferrero-Carr, LLP, 301 W. Hallandale Beach Boulevard, Hallandale Beach, Florida 33009 ("Payor"), hereby promises to pay to the order of COEG, LLC, with a mailing address of c/o Rozencwaig, Nadel & Ferrero-Carr, LLP, 301 W. Hallandale Beach Boulevard, Hallandale Beach, Florida 33009 ("Payee"), the principal sum of One Million Dollars ($1,000,000) in lawful money of the United States together with no interest thereon.

A.      Payments shall be due to Payee upon receipt by Payor of any payments as provided in the Stockholders' Agreement dated _____, 2006 for Innovida Holdings, Inc., a Florida corporation.

B.      This Note is prepayable without penalty in whole or in part, at any time with written notice to Payee.

C,      Upon the occurrence of any failure by Payor to comply with its payment or other material obligations hereunder, or at any time thereafter, at the option of Payee, Payor shall be in default hereunder and, unless such default has been cured within five (5) days after receipt of written notice (as provided herein) by Payor of such default, all of the obligations of Payor under this Note (including but not limited to the payment of all accrued and unpaid interest and the entire outstanding principal balance) shall become immediately due and payable, without further notice or demand by Payee. In addition, during any period of default hereunder which shall last beyond five (5) days following Payor's receipt from Payee of written notice specifying such default, the interest rate on the outstanding principal balance shall be eighteen percent (18%) (the "Default Interest"). The Default Interest shall begin to accrue on the aforementioned fifth (5th) day. Upon a default by Payor under this Note, Payor shall in addition to all other amounts due under this Note, pay, on demand, all costs of collection, and reasonable attorneys' fees and court costs paid or incurred by Payee, in enforcing this Note.

D.      Notwithstanding anything in this Note or in any related agreement to the contrary, it is not the intention of the parties to charge, nor shall there at any time be charged: any interest (whether fixed, contingent, or otherwise) which would result in a rate of interest being charged which is in excess of the maximum rate permitted to be charged by applicable law; and in the event that any sum in excess of the maximum legal rate of interest is paid or charged, the same shall immediately upon discovery thereof, be deemed to have been a prepayment of principal as of the date of such receipt, and all payments made thereafter shall be appropriately reapplied to interest and principal to give effect to the maximum rate permitted by applicable law.

E.      Nothing in this Note shall prohibit Payee from transferring this Note to any successor(s) in interest, provided Payor consents to such transfer in writing. The provisions of this Note shall have the same force and effect with regard to any of said successor(s) in interest as they do with Payee.

F.      "Holder" shall mean Payee or any endorsee, assignee, or transferee of this Note who is in possession of it and entitled to payment in accordance with the preceding paragraphs.

G,      This Note shall be governed by the laws of the State of Florida without regard to its conflict of laws principles.

H       Upon receipt of evidence reasonably satisfactory to Payor of the loss, theft, destruction or mutilation of this Note, and upon the prior written notice to Payee and the written confirmation from Payee of the loss, theft, destruction or mutilation of the Note and the receipt of indemnity or security reasonably satisfactory to Payor from the one claiming ownership hereof, or in the case of mutilation, upon surrender of the mutilated Note, thereupon Payor will make and deliver to such claimant a new Note of like tenor, in lieu of this Note.

I        Except as otherwise provided in this Note, each maker, endorser, surety and guarantor of this Note hereby waives demand, presentment, protest, notice of dishonor, suit and any other condition precedent to action against such party for the collection hereof, and each severally agrees that, without notice to or consent of any such party, time of payment may be extended or a renewal note taken, or other indulgence granted, without the same releasing any such party from any liability hereunder.

J,      No delay or omission on the part of Payee in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder. No waiver of any right shall be effective unless in writing signed by Payee, nor shall a waiver on one occasion be construed as a bar to or waiver of any such right on any other occasion.

CONFIDENTIAL                                                          GOMEZ001441

K.      The term "Payee" shall also be defined to include any subsequent holders of this Note

L.      Any notice, request, demand, offer, payment, or communication required or permitted to be given by any provision of this Note shall be deemed delivered and given for all purposes if written and if delivered personally or by courier or delivery service, at the time of such delivery or, if directed by registered or certified United States mail, postage and charge prepaid, addressed to the intended recipient, at the address specified in this Note, at such time that the intended recipient or its agent signs or executes the receipt. Either Payor or Payee may change the address to which notices are to be mailed to them by giving notice as provided herein to the other.

Payor has executed this Note this _____ day of _____, 2006.

Payor
Innovida Holdings, Inc.

By: _____
     Claudio Osorio, President

                                                        C. O.

By: _____
     Evelio Gomez, Secretario

F:\WPDATA\BENTATA\1674\DOCUMENTS\PROMISSORY NOTE INNOVIDA HOLDINGS#2.DOC

2

CONFIDENTIAL                                                        GOMEZ001442

# Exhibit C

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 10-46330 CA 40

CORE DEVELOPMENT HOLDINGS
CORPORATION,

Plaintiff,

v.

CLAUDIO OSORIO,
AMARILIS OSORIO,
INNOVIDA, INC., a Delaware
corporation, INNOVIDA HOLDINGS, LLC
f/k/a COEG, LLC, a Florida limited liability
company, and INNOVIDA SERVICES,
INC. f/k/a INNOVIDA HOLDINGS, INC., a
Florida corporation,

Defendants. _____ /

## AMENDED COMPLAINT

Plaintiff, Core Development Holdings Corporation ("**Core**"), sues Defendants, Claudio Osorio ("**Claudio**"), Amarilis Osorio ("**Amarilis**"), InnoVida, Inc. ("**Inc.**"), InnoVida Holdings, LLC f/k/a COEG, LLC ("**Holdings**"), and InnoVida Services, Inc. f/k/a InnoVida Holdings, Inc. ("**Services**"), and alleges:

## NATURE OF THE ACTION

1.    This is an action by Plaintiff, Core against Defendants, Claudio, Amarilis, Inc., Holdings, and Services to establish Core's ownership interest in the InnoVida group of companies, and in particular Holdings and its wholly owned subsidiary companies, or alternatively to recover the value of Core's capital contributions and financing extended to the

InnoVida group of companies.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff, Core is a Florida corporation based in Miami-Dade County, Florida. Core's principal and sole owner is Engin Yesil (**"Engin"**).

3. Defendant, Claudio is an individual who resides and resided at all times material in Miami-Dade County, Florida. Claudio is the principal of Inc., Holdings, and Services. Claudio is subject to this Court's personal jurisdiction.

4. Defendant, Amarilis is an individual who resides and resided at all times material in Miami-Dade County, Florida. Amarilis is Claudio's wife and is an officer, manager, and/or director of several entities comprising the InnoVida group of companies. In particular and without limitation, Amarilis is a manager and officer of Holdings; InnoVida US, LLC; InnoVida MRD, LLC; InnoVida Central Florida, LLC; and InnoVida Southeast Construction, LLC. Amarilis is also an officer and director of Services. Amarilis is subject to this Court's personal jurisdiction.

5. Defendant, Inc. is a Delaware corporation that is engaged in business in the State of Florida. Inc. is subject to this Court's personal jurisdiction.

6. Defendant, Holdings is a Florida limited liability company based in Miami-Dade County, Florida. Holdings is subject to this Court's personal jurisdiction. Holdings was formerly known as COEG, LLC.

7. Defendant, Services is a Florida corporation based in Miami-Dade County, Florida. Services is subject to this Court's personal jurisdiction. Services was formerly known as InnoVida Holdings, Inc.

8. This Court has subject matter jurisdiction over Core's causes of action alleged herein against Defendants because Core's damages exceed $15,000.00 exclusive of interest,

2

costs, and attorneys' fees.

9.      Venue is proper in this Court pursuant to Fla. Stat. §§ 47.011, 47.041, and 47.051

because (a) the causes of action alleged herein accrued in Miami-Dade County, Florida; (b)

Defendants, Claudio, Amarilis, Holdings, and Services reside and transact business related to this

action in Miami-Dade County, Florida; (c) Defendant, Inc.'s agent or representative is located in

Miami-Dade County, Florida; and (d) Defendants' wrongful conduct occurred in Miami-Dade

County, Florida.

## GENERAL ALLEGATIONS

### A.      Engin and Claudio Become Acquainted.

10.      In late 2006, Engin's CPA Raimundo Lopez-Lima Levi ("Levi") introduced

Engin to Claudio. Levi knew Claudio through another client of his and spoke highly of Claudio

and his InnoVida enterprise. Around the same period, Engin's ex-wife became acquainted with

Amarilis through a social gathering that was held for residents of Star Island in Miami Beach.

The two became friends. Amarilis and Claudio ultimately together solicited investments from

Engin and Core in the InnoVida enterprise. At the time, Claudio was an entrepreneur in the

business of manufacturing, marketing, and selling prefabricated walls and related building

components to residential, commercial, and governmental customers located throughout the

United States and abroad.

11.      Claudio's business was structured through a conglomerate of corporate entities,

all of which were controlled by Claudio by and through Inc. and in which it appeared that

Amarilis was also in control, and in where she was an officer, manager, and/or director.

Individually and collectively, Inc. and its subsidiaries and joint ventures allowed Inc. to have a

national and worldwide sales platform.

3

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

12.     At the time Engin was introduced to Claudio, Inc. was continuing to expand its national and global reach, and Inc. was seeking out investors to assist Inc. in entering new markets.

**B.     Core Invests in Inc.**

13.     In late 2006 and early 2007, Claudio expressed to Engin his interest in further expanding Inc.'s worldwide presence. Claudio solicited Engin to invest in Inc. and took him to the Emirate of Dubai to tour the InnoVida Production Plant and to view an InnoVida sample house in late 2006.

14.     In early 2007, Claudio solicited Core to invest in Inc. and thereby acquire a 30% ownership interest in Inc. At the time, Claudio was the sole owner of all 1,000 outstanding shares of Inc.'s stock.

15.     On March 8, 2007, Claudio, as seller, and Core, as purchaser, entered into a Purchase and Sell Stock Agreement Between Claudio Osorio and Core, Inc. (the **"Purchase and Sale Agreement"**). A copy of the Purchase and Sale Agreement is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

16.     Pursuant to the terms of the Purchase and Sale Agreement, Core purchased 300 shares of Inc.'s stock (and accordingly a 30% ownership interest in Inc.) in exchange for payment to Claudio in the amount of $6,303,400.00. In connection with the transaction, Claudio issued stock certificates to Core reflecting Core's 30% ownership interest in Inc. Copies of Core's stock certificates are attached hereto as **Composite Exhibit "B"** and are incorporated herein by reference.

17.     Although it was understood and agreed by Core and Claudio that Core was the purchaser of the shares, the Purchase and Sale Agreement contains a scrivener's error

4

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

misidentifying the purchaser as "Core, Inc."

18.     In paragraph 3 of the Purchase and Sale Agreement, Claudio purported to identify Inc.'s various subsidiary entities in which Engin had acquired an ownership interest by virtue of becoming a 30% owner of Inc. Claudio represented that Inc.'s subsidiaries included (a) 100% ownership of "InnoVida Holdings, Inc.," a company purportedly formed and existing in the Cayman Islands, which in turn purportedly owned 51% of a German entity known as "Innores GmbH"; (b) 100% ownership of Holdings (which was then known as "COEG, LLP"); and (c) 75% ownership of Services (which was then known as "InnoVida Holdings, Inc.").

19.     Engin personally searched for and rented an office after negotiating with the Landlord on Lincoln Road for the new headquarters of InnoVida group of companies. Engin and Claudio had offices side by side at the Lincoln Road office.

20.     Upon information and belief, Claudio and Amarilis misrepresented the nature and extent of Inc.'s ownership interest in its subsidiary entities and joint ventures. In particular and without limitation, it is believed that (a) Services is wholly owned by InnoVida (as opposed to Inc.'s purported 75% interest as represented in the Purchase and Sale Agreement); and (b) Claudio omitted from the Purchase and Sale Agreement Inc.'s ownership interests in several entities and joint ventures in the United States and abroad.

## C.     Core Invests Additional Funds in Inc.

21.     In late April or early May 2007, Claudio represented to Engin that Claudio and Amarilis had invested additional funds in Inc. Specifically, Claudio claimed that they invested an additional $3,996,426.47 in Inc. At that time, he requested that Core contribute additional financing coinciding with its 30% ownership interest, which came to approximately $1.7 million. Core agreed to immediately provide the requested additional funding and in fact did so; however,

5

despite Core's requests, Claudio has never provided Core with any documentation confirming that his purported additional investment in Inc. was actually made by Claudio and/or Amarilis.

22.     Based upon Claudio and/or Amarilis' purported additional investment in Inc., Claudio represented to Engin that Core would be required to invest additional funds exceeding $1.7 million in order to maintain, preserve, and protect Core's 30% ownership interest in Inc. In connection with making these representations, Claudio provided Engin with a list of Inc.'s purported expenses and recent purchases (which included machinery and other equipment) which he claimed justified and necessitated Core's additional investment. During this period, Claudio continued to represent that Inc. had a promising future and was continuing to grow and expand.

23.     Based upon Claudio's representations, Engin agreed that Core would invest additional funds in Inc.

24.     Core's additional investment in Inc. was ultimately memorialized by a Convertible Note (the "Note") setting forth an obligation to repay in full the principal of the loan with interest at the rate of 7% per annum no later than December 31, 2007, or alternatively permitting Core to convert some or all of the debt obligation to Core to shares of Inc.'s stock. On May 2, 2007, as directed by Claudio, Core paid the amount of $1,712,754.20 to Services pursuant to the terms of the Note. A copy of the Note is attached hereto as **Exhibit "C"** and is incorporated herein by reference.

25.     The Note identifies the borrower as Services, however, it was always understood by Core and intended by Claudio that Inc. would be the recipient of the money.

26.     To date, Inc. has failed to (a) repay any of the principal or interest due to Core under the terms of the Note; (b) recognize or acknowledge Core's 30% ownership interest in

Inc.; or (c) convert any other portion of its debt obligation to additional shares in favor of Core. Additionally, Core has learned that Claudio unlawfully and without Core's knowledge or authorization purported to transfer the Note to himself personally, thereby making Claudio the beneficiary of Core's payment obligation under the Note. Upon information and belief, the foregoing was done with Amarilis' knowledge and while she was an officer of various InnoVida-related entities in flagrant disregard of Core's 30% ownership interest in these entities and accordingly in violation of her fiduciary obligations to Core.

## D. Claudio and Amarilis Restructure the InnoVida Group of Companies Without Notice to Core or Core's Knowledge or Consent.

27. In mid to late 2007, there was discussion by the parties concerning the potential restructuring of the InnoVida group of companies for tax and other purposes. During this period, counsel for the InnoVida entities circulated memoranda dated July 31, 2007 and October 2, 2007 confirming Core's 30% ownership interest in the InnoVida-related entities.

28. Also during this period, Core continued to request proof that Claudio and/or Amarilis had actually invested additional funds in Inc.; however, Claudio and Amarilis continued to fail and/or refuse to provide Core with any such documentation. The disagreements between the parties regarding this issue culminated with counsel for the InnoVida companies' circulation of a third memorandum which removed any reference to Core's 30% ownership interest in the companies. In response, Core's counsel sent counsel for the InnoVida companies correspondence dated February 8, 2008 confirming Core's 30% ownership interest in the companies.

29. Some time in 2008, Claudio and Amarilis caused the restructuring of the InnoVida group of companies. Prior to that time, Inc. effectively had been the parent entity of most of several subsidiary entities through which Inc. had been conducting its business.

7

30.     Upon information and belief, Claudio and Amarilis caused the restructuring of various entities such that the majority if not all of the InnoVida-related entities were brought under the control of Holdings. The restructuring was effectuated without notice to Core and without Core's knowledge or consent despite Core's 30% ownership interest in Inc., Holdings, and their related companies. The restructuring was also accomplished while Claudio and Amarilis were officers, managers, and/or directors of various InnoVida-related entities and accordingly in violation of their fiduciary duties to Core. To the extent that the restructuring was intended to purposefully extinguish Core's 30% ownership interest, it was ineffective in doing so.

31.     Moreover, pursuant to the Purchase and Sale Agreement, Core acquired a 30% ownership interest in COEG, LLC, which was Holdings' predecessor entity. Core therefore holds a 30% ownership interest in Holdings and its wholly owned subsidiaries, along with its respective ownership interest in any entities which are less than wholly owned by Holdings.

32.     Despite the restructuring of the InnoVida group of companies brought about by Claudio and Amarilis, which was insufficient to extinguish Core's 30% ownership interest, Claudio, Amarilis, Inc., Holdings, and the other Defendants have wrongfully failed and/or refused to properly document Core's 30% ownership interest in the restructured entities.

33.     Upon information and belief, Amarilis participated in and/or was complicit with respect to Claudio's wrongdoing in restructuring the InnoVida-related entities.

E.     **Claudio's, Inc.'s, and Holdings' Other Wrongdoing.**

34.     Despite Core's collective investment of over $8 million in Inc. (and accordingly now Holdings), and despite the stock certificates reflecting shares of Inc.'s stock that have already been issued to Core, Claudio, Amarilis, Inc., and Holdings have consistently refused to

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

acknowledge or recognize Core's ownership interest in Inc. and Holdings and, derivatively, Core's interest in Holdings' subsidiaries and joint ventures. Instead, Claudio has misrepresented that Inc. and Holdings have either been dissolved or are otherwise inactive. Notwithstanding, in reality Holdings is an active company engaged in operations in the United States and overseas.

35.    In fact, in the spring of 2010, Inc. and/or Holdings misrepresented to the Overseas Private Investment Corporation ("**OPIC**"), which provides financing to business ventures in developing countries, that Core had no ownership interest in Inc. or Holdings or their subsidiary or related entities.

36.    Additionally, Claudio, Amarilis, Inc. and Holdings have taken several actions without Engin's or Core's knowledge, consent, or consultation including but not limited to the following: (a) restructuring Inc.'s corporate structure and/or consolidating its subsidiaries and related entities, thereby bringing the InnoVida empire under the control of Holdings; (b) allowing Inc. to become an inactive corporation by failing and/or refusing to make annual filings and pay fees required under Delaware law; (c) causing Holdings' subsidiaries to undergo name changes; (d) transferring Inc.'s and/or Holdings' interest in the ownership of various entities; (e) failing to take action with regard to certain entities that were required to be transferred to Inc.; and (f) issuing new securities in various InnoVida-related entities to third party investors.

37.    Claudio, Amarilis, Inc., and Holdings have also failed and/or refused to allow Engin or Core full and complete access to Inc.'s and Holdings' books and records and have effectively shut them out of the business entirely.

38.    Upon information and belief, Amarilis participated in, furthered, and/or was otherwise complicit in one or more of the foregoing wrongful actions.

39.    All conditions precedent to the maintenance of this action have occurred, been

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

performed, or have otherwise been satisfied or waived.

40.    Plaintiffs have retained the undersigned counsel and have agreed to pay them a reasonable fee for their services.

## COUNT I
## DECLARATORY JUDGMENT
### (*Against Inc., Holdings, and Services*)

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

41.    This is an action by Plaintiff, Core against Defendants, Inc., Holdings, and Services seeking a declaratory judgment.

42.    Plaintiff, Core has contributed a total of $8,016,154.20 in capital to Inc. (and thereby Holdings) in connection with obtaining (a) Core's 30% interest in Inc.; (b) Core's 30% interest in Inc.'s (and thereby Holdings') wholly owned subsidiaries; and (c) Core's 30% interest in Inc.'s (and thereby Holdings') ownership of entities which are less than wholly owned by Inc.

43.    Core's 30% ownership interest in Inc. (and thereby Holdings) is evidenced in part as follows:

> a. By Core's investment in the amount of $6,303,400.00 in Inc. pursuant to the requirements of the Purchase and Sale Agreement;
>
> b. By Core's additional investment in the amount of $1,712,754.20 in Inc. in accordance with the terms of the Note, which specifically authorizes the conversion of Inc.'s debt obligation to shares of Inc.'s stock in Core's name; and
>
> c. By Claudio's issuance of stock certificates in Inc. to Core, which collectively reflect 300 shares of the total 1,000 outstanding shares in Inc. in favor of Core.

44.    Despite Core's collective investment of over $8 million in Inc. (and thereby Holdings), and despite the stock certificates reflecting shares of Inc.'s stock that have already

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

been issued to Core, Claudio, Inc., and Holdings have continued to refuse to acknowledge or recognize Core's ownership interest in Inc. and Holdings and, as a result, Holdings' subsidiaries and joint ventures.

45.     An actual case or controversy exists between the parties, including relating to Core's position that Core rightfully acquired a 30% ownership interest in Inc., and that Inc., Holdings, and Services are required to recognize (a) Core's 30% interest in Inc. (and thereby Holdings); (b) Core's 30% interest in Holdings' wholly owned subsidiaries; and (c) Core's 30% interest in Holdings' ownership of entities which are less than wholly owned by InnoVida.

46.     Accordingly, there is a bona fide, actual, present practical need for the declaration sought herein.

47.     To prevent irreparable harm, Core respectfully requests a declaration from this Court that (a) Core holds a 30% interest in Inc. and Holdings; (b) Core holds a 30% interest in Holdings' wholly owned subsidiaries; and (c) Core holds a 30% interest in Holdings' ownership of entities which are less than wholly owned by InnoVida.

48.     Core's rights are dependent on the facts and/or the law applicable to the facts recited herein.

49.     Defendants, Inc., Holdings, and Services have an actual, present, adverse, and antagonist interest in the subject matter hereof, either in fact or law.

50.     The antagonistic and adverse interests are all before this Court by proper process, and the relief sought herein is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands judgment against Defendants, InnoVida, Inc., InnoVida Holdings, LLC, and InnoVida Services, Inc. as

11

follows:

  a.  An Order declaring that Core holds a 30% ownership interest in Inc. and Holdings;

  b.  An Order declaring that Core holds a 30% ownership interest in Holdings' wholly owned subsidiaries including but not limited to Services;

  c.  An Order declaring that Core holds a 30% ownership interest in Holdings' ownership of entities which are less than wholly owned by Holdings; and

  d.  Such other and further relief this Court deems just and proper.

## COUNT II
## BREACH OF PURCHASE AND SALE AGREEMENT
### (Against Claudio)

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

51.   This is an action by Plaintiff, Core against Defendant, Claudio arising from Claudio's breach of the Purchase and Sale Agreement.

52.   On March 8, 2007, Claudio, as seller, and Core, as purchaser, entered into the Purchase and Sale Agreement. A copy of the Purchase and Sale Agreement is attached hereto as Exhibit "A" and is incorporated herein by reference.

53.   Pursuant to the terms of the Purchase and Sale Agreement, Core purchased 300 shares of Inc.'s stock (and accordingly a 30% ownership interest in Holdings) in exchange for payment to Claudio in the amount of $6,303,400.00. In connection with the transaction, Claudio issued stock certificates to Core reflecting Core 30% ownership interest in Inc. Copies of Core's stock certificates are attached hereto as Composite Exhibit "B" and are incorporated herein by reference. It was understood that the payment by Core would remain with Inc. in order to expand its business.

54.   Although it was understood and agreed by Core and Claudio that Core was the

purchaser of the shareholder interests set forth in the Purchase and Sale Agreement, the Purchase and Sale Agreement misidentifies the purchaser as "Core, Inc."

    55.    Defendant, Claudio has breached the Purchase and Sale Agreement as follows:

        a.    By failing and/or refusing to recognize (a) Core's 30% interest in Inc. and Holdings;

        b.    By failing and/or refusing to recognize Core's 30% interest in Holdings' wholly owned subsidiaries; and

        c.    By failing and/or refusing to recognize Core's 30% interest in Holdings' ownership of entities which are less than wholly owned by Holdings.

        d.    Upon information and belief by failing to contribute the payment to Inc. and retaining same for his own benefit.

    56.    As a proximate result of Claudio's breaches of his obligations under the Purchase and Sale Agreement, Core has lost the value and benefit of its $6,303,400.00 investment and accordingly has been damaged.

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands judgment against Defendants, Claudio Osorio and Amarilis Osorio for damages, court costs, interest, and such other and further relief as this Court deems just and proper.

### COUNT III
### BREACH OF NOTE
### *(Against Services)*

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

    57.    This is an action by Plaintiff, Core against Defendant, Inc. arising from Services' failure to abide by the payment terms of the Note or convert all or a portion of Services' debt obligation into shares of Inc.'s stock for Core's benefit.

    58.    On March 2, 2007, Inc. executed and delivered the Note, a copy being attached, to

13

Core in Miami-Dade County, Florida.

59.     Plaintiff, Core owns and holds the Note.

60.     Pursuant to the terms of the Note, Services was obligated to pay Plaintiff, Core principal and interest as provided for in the payment schedule therein.

61.     Services failed to pay the principal and interest due on the Note on or before the due date set forth in the Note of December 31, 2007. Accordingly, Services has failed and refused to comply with its payment obligations to Core under the Note.

62.     Additionally, paragraph 2 of the Note provides that Core may elect to convert all or a portion of Services' debt obligation to shares of Inc.'s stock. Inc. has failed and/or refused to comply with its obligations under paragraph 2 of the Note by refusing to recognize Core's ownership interest in Inc. (and accordingly Holdings).

63.     Accordingly, Services has breached its obligations and defaulted under the terms of the Note.

64.     The full amount of unpaid principal and accrued but unpaid interest due and owing to Core by Inc. is immediately due.

65.     Plaintiff, Core has suffered substantial damages as a direct and proximate result of Inc.'s breach of its obligations under the Note.

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands judgment against Defendant, InnoVida Holdings, Inc. for damages plus interest, costs, and attorneys' fees pursuant to the terms of the Note, along with such other and further relief this Court deems just and proper.

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.• MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131• 305.379.9000

## COUNT IV
## RESTATEMENT (SECOND) OF TORTS § 552
*(Against Claudio and Amarilis)*

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

66.     This is an action Plaintiff, Core against Defendants, Claudio and Amarilis based upon the Restatement (Second) of Torts § 552.

67.     At all times material, in his capacity as Inc.'s principal and Holdings' principal/manager, Claudio was in the business, profession, or employment of soliciting new investors to fund InnoVida's business expansion. Amarilis was also in the business, profession, or employment of soliciting new investors to fund InnoVida's business expansion in her capacity as officer, manager, and/or director of various InnoVida-related companies.

68.     Claudio and Amarilis had a direct pecuniary interest in soliciting Core's investments in Inc. (and thereby Holdings) on two (2) separate occasions.

69.     First, Claudio and Amarilis had a direct pecuniary interest in Core's purchase from him of 30% of Inc.'s then outstanding shares of stock. The amount paid to Claudio (and accordingly to Amarilis since she was married to and in business with Claudio at the time) pursuant to that transaction was $6,303,400.00, which was deemed to have been paid on March 8, 2007 pursuant to the terms of the Purchase and Sale Agreement. In that transaction, Claudio (and accordingly Amarilis) sold 300 shares of Inc.'s total 1,000 outstanding shares to Core.

70.     Second, Claudio and Amarilis had a direct pecuniary interest in Core's additional investment in the amount of $1,712,754.20, which was made on May 2, 2007 in accordance with the terms of the Note. Claudio (and accordingly Amarilis since she was married to and in business with Claudio at the time) purportedly made his own additional investment in Inc. in the

KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L. • MIAMI CENTER, 17TH FLOOR, 201 SO. BISCAYNE BLVD., MIAMI, FL 33131 • 305.379.9000

amount of $3,996,426.47 nearly contemporaneously with Core's additional investment in Inc.

71.     In each of the aforementioned transactions, Claudio and Amarilis supplied false information for the guidance of Core in its business transactions. Specifically, on various occasions in early 2007 up until Core made its initial investment in early March 2007, Claudio and Amarilis falsely advised Core that its initial investment in the amount of $6,303,400.00 would secure Core's 30% ownership interest in Inc. and its wholly owned subsidiaries. Additionally, in late April or early May 2007, Claudio falsely advised Engin that Claudio and Amarilis had invested an additional $3,996,426.47 in Inc., and Core would be required to contribute an additional amount of approximately $1.7 million in order to preserve Core's 30% ownership interest in Inc. and its wholly owned subsidiaries.

72.     Moreover, Claudio and Amarilis supplied to Core false information regarding the role of several prominent political and business figures on InnoVida's board of directors. Specifically, at the time that Core made its initial investment, Claudio and Amarilis represented to Core that former Governor of Florida Jeb Bush, Jorge Perez (a prominent real estate developer), and General Wesley Clarke (a prominent national figure) were members of the board of directors of Inc., and they would each actively contribute their respective political and/or business acumen and influence to advance the InnoVida enterprise. However, after Core had made its investment, it became apparent that these members of the board of directors were nothing more than figureheads who had little input at all into the operations and development of the InnoVida enterprise. The meetings of the board of directors were few and far between, and the members of the board of directors otherwise did not contribute their political and business acumen and influence to advance the InnoVida enterprise.

73.     Core justifiably relied on Claudio's and Amarilis' representations given that

16

Claudio was at all times material Inc.'s majority shareholder and Claudio had represented to Core that he had invested his and his wife's personal funds in Inc. Core's reliance was justifiable because at the time that Core made its initial investment in March 2007, and again at the time that Core made its additional investment in late April or early May 2007, Claudio and Amarilis promised Core that they would provide Core with appropriate documentation verifying that Claudio and Amarilis had invested their personal funds in the company. Core's reliance was further justifiable because Claudio and Amarilis had been introduced to Core's principal as reputable and ethical businesspersons who had a track record of business successes. At the time, Amarilis was also an officer, manager, and/or director of various InnoVida-related entities. Notwithstanding, Claudio and Amarilis failed and/or refused to provide Engin or Core with any documentation supporting their representations that he had invested funds in Inc., and he failed to provide a proper accounting at the time that Core was asked to and in fact did provide additional funding to Inc.

74. Moreover, Claudio and Amarilis made false statements to Core and provided inaccurate data to Core in connection with soliciting additional investment monies from Core. In particular and without limitation, Claudio and Amarilis advised Core that approximately $34 million had been invested, loaned, or expensed by or on behalf of Holdings and its subsidiaries as of mid-September 2007. However, when Core requested supporting documentation, the documents provided by Claudio and Amarilis did not even support one fifth of the claimed investments, loans, or expenditures. Claudio further claimed that of the $34 million, approximately $14 million had been invested in an InnoVida-related company known as Innores GmbH pursuant to a written agreement written in German. Core later learned that the written agreement was nothing more than a supply agreement.

17

75.     Additionally, based upon Claudio's and Amarilis' reputation as successful businesspersons having connections with high ranking political and business personalities, Core justifiably relied on Claudio's and Amarilis' representations that the aforementioned members of the board of directors would actively contribute their political and business acumen and influence to advance the InnoVida enterprise.

76.     Claudio and Amarilis failed to exercise reasonable care or competence in obtaining or communicating the aforementioned information to Core. Specifically, Claudio and Amarilis failed to exercise reasonable care or competence in communicating to Core on various occasions in early 2007 up until Core made its initial investment in early March 2007 that Core's initial investment in the amount of $6,303,400.00 would secure Core's 30% ownership interest in Inc. and its wholly owned subsidiaries when in fact they intended that Core's initial investment would not secure any such ownership interest. Claudio also failed to exercise reasonable care or competence in communicating to Engin in late April or early May 2007 that Claudio and Amarilis had invested an additional $3,996,426.47 in Inc. when he had not timely done so, and that Core would be required to contribute an additional amount of approximately $1.7 million in order to preserve Core's 30% ownership interest in Inc. and its wholly owned subsidiaries when in fact it was not necessary for Core to do so because Claudio and Amarilis had not timely made their own additional investment.     Additionally, Claudio and Amarilis failed to exercise reasonable care or competence in communicating to Core at the time that Core made its initial investment that the members of the board of directors were nothing more than figureheads who were not actively involved in the development of the company and who would not be exercising their respective political and/or business acumen and influence to advance the company. Claudio and Amarilis also misrepresented information to OPIC by failing and/or refusing to disclose

18

Core's ownership interest in the InnoVida group of companies in connection with wrongfully receiving government funding.

77. Upon information and belief, Amarilis participated in, furthered, and/or was complicit in Claudio's wrongful actions described herein despite her fiduciary obligations to Core as an officer of various InnoVida-related companies.

78. Accordingly, Claudio and Amarilis are subject to liability for Core's pecuniary losses resulting from Claudio's false representations relating to Core's ownership interest in Inc. (and thereby Holdings).

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands judgment against Defendants, Claudio Osorio and Amarilis Osorio for damages, court costs, and such other and further relief as this Court deems just and proper.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (*Against Claudio and Amarilis*)

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

79. This is an action Plaintiff, Core against Defendants, Claudio and Amarilis for breach of fiduciary duty.

80. At all times material, Claudio and Amarilis were officers, managers, and/or directors of Inc., Holdings, Services, and various other InnoVida-related entities. Accordingly, in their respective capacities they owed fiduciary duties to Core (who is a 30% owner of Inc., Holdings, and their subsidiaries).

81. Claudio and Amarilis breached their fiduciary duties to Core as follows:

        a.    By restructuring the InnoVida group of companies without notice to Core or Core's permission such that the majority of the active

companies were brought under the control of Holdings and specifically without recognizing Core's 30% interest in the newly restructured organization;

b. By failing and/or refusing to recognize (a) Core's 30% interest in Inc. and Holdings;

c. By failing and/or refusing to recognize Core's 30% interest in Holdings' wholly owned subsidiaries;

d. By failing and/or refusing to recognize Core's 30% interest in Holdings' ownership of entities which are less than wholly owned by Holdings;

e. By converting or otherwise retaining Core's investment in Inc. for his own use; and

f. By denying Core's requests for access to the books and records of Inc., Holdings, Services, and other InnoVida-related entities and subsidiaries.

82.    Core has sustained damages proximately caused by Claudio's and Amarilis' breach of their fiduciary duties, including but not limited to the loss of Core's capital contributions and/or Core's loss of equity and value in the entities.

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands judgment against Defendants, Claudio Osorio and Amarilis Osorio for damages, court costs, and such other and further relief as this Court deems just and proper.

## COUNT VI
### ACCOUNTING
#### (*Against Inc., Holdings, and Services*)

Plaintiff, Core readopts and realleges its allegations set forth in paragraphs 1 through 40 above as if fully set forth herein.

83.    This is an equitable action for an accounting by Core against Defendants, Inc., Holdings, and Services.

84.    As a shareholder of Inc., Holdings, and Services, Core is entitled to a full

accounting of Inc., Holdings, Services, and their subsidiaries, among other things, to fully ascertain (a) what business the companies are engaged in; (b) the corporate structure of the companies; (c) the revenues and profits of the companies; and (d) any distributions made from the companies to other owners.

85.     Inc., Holdings, and Services are the entities behind what began as an already complex corporate structure at the time that Core made its initial investment, and later became even more complex after the InnoVida enterprise was restructured without Core's consent. By way of example, at the time Core made its initial investment, the corporate structure of the InnoVida enterprise was represented to Core by Defendants to be as shown in the attached **Exhibit "D"**, which is incorporated herein by reference. However, after Core's investment had been made, the InnoVida group of companies apparently underwent a major overhaul and restructuring. Among the many confusing, vague, and ambiguous flow charts Core has come into possession of is the attached **Exhibit "E,"** which is incorporated herein by reference and which appears to contradict the corporate structure reflected in Exhibit " D" Accordingly, it is not clear that the remedy at law is as full, adequate, and expeditious as it is in equity since Core needs to determine the identities of the InnoVida companies in which Core has an ownership interest and the relationship between and among the companies.

86.     Additionally, based upon Claudio's and Amarilis' misrepresentations regarding the amount and timing of their investments in Inc., and based upon Core's status as a shareholder of Inc., Holdings, and Services, Core is entitled to a full accounting from Inc., Holdings, and Services regarding the amount and timing of Claudio's and Amarilis' investments.

87.     Inc., Holdings, and Services are behind the complex corporate structure of the InnoVida group of companies, and it is not clear that the remedy at law is as full, adequate, and

CASE NO.: 10-46330 CA 40

expeditious as it is in equity.

**WHEREFORE,** Plaintiff, Core Development Holdings Corporation demands that this Court appoint an independent accountant to perform an accounting of InnoVida, Inc., InnoVida Holdings, LLC, and InnoVida Services, Inc., and for such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Core demands a jury on all issues so triable.

Dated: December 22, 2010.

> **KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**
> *Attorneys for Plaintiff*
> 17th Floor, Miami Center
> 201 South Biscayne Blvd.
> Miami, Florida 33131
> Telephone: (305) 379-9000
> Facsimile: (305) 379-3428
>
> By:
> **ABBEY L. KAPLAN**
> FL Bar No. 200255
> akaplan@klugerkaplan.com
> **CASEY H. CUSICK**
> FL Bar No. 755931
> ccusick@klugerkaplan.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by *facsimile* and *U.S. mail* this 2nd day of December, 2010 on: **Jonathan S. Robbins, Esq.,** Akerman Senterfitt, Las Olas Centre II, Suite 1600, 350 E. Las Olas Blvd., Fort Lauderdale, Florida 33301.

> By:
> **CASEY H. CUSICK**

22

## PURCHASE AND SELL STOCK AGREEMENT BETWEEN CLAUDIO OSORIO AND CORE INC.

Agreement made this 5th day of March, 2007, by and between Claudio Osorio "Osorio" whose address is 15 West Star Island, Miami Beach, Florida 33139 USA "Seller" and Core Inc., whose address is 1080 NW 163 Dr. Miami, Fl 33169 U.S.A., called the "Buyer."

Seller sells to buyer, and buyer purchases from seller, 300 shares of the common stock of Innovida Inc., a Delaware corporation at the price and on the terms and conditions set forth.

1.   Purchase price: The price to be paid by buyer to seller for the shares of common stock of Innovida Inc., shall be Seventeen Thousand Five Hundred Seventeen Dollars ($ 20,844 67) per share or an aggregate purchase price of Three Million Five Hundred Three Thousand and Four Hundred Dollars ($ 6,303,400).

2.   Percentage of the company: Shares to be sold to seller represent 30% of the authorized and outstanding stock of Innovida Inc.,

3.   Subsidiaries: Innovida Inc., owns:

   100% of the share capital of Innovida Holdings Inc., a Cayman Islands company "Cayman". Cayman owns 51% of Innoeu GmbH a German Company. This company is the ownership vehicle for manufacturing of raw materials and house elements and components not made with Innovida materials also alternate business models like the rental business.

·   75% of the share capital of Innovida Holdings, a Florida company "Florida". Ownership of Florida is held.

      ∴   50% through a callable convertible note in the name of Innovida Inc., and,

      c.   25% through CORG LLP., a Florida Limited Partnership owned 100% by Innovida Inc.

4.   Delivery of stock and payment of purchase price.

   a)   The certificate or certificates for the shares of common stock sold by seller are delivered to buyer, duly endorsed for transfer to buyer, and buyer acknowledges receipt of the certificate or certificates.



b1.   The purchase price shall be paid to:

Deutsche Bank Trust Company Americas

P.O. Box 1519, Wall Street Station, New York, New York, USA

ABA#021-001-033

SWIFT CODE: BKTRUS33

Account: Royal Bank of Canada Trust Company (Cayman) Ltd
Account number: 61-011-867

For further credit to Claudio Osorio account number 7198351

5.   Successors and assigns. The provisions of this agreement shall inure to the benefit of and bind the successors and assigns of buyer and the trustees, executors, administrators, heirs, successors, and assigns of seller.

6.   Transfer of shares held by Osorio and/or Core Inc., to entities controlled by Osorio or Core Inc., does not require approval among shareholders but only a written notification in advance of the transfer.

7.   Shareholders Osorio and Core Inc. have agreed to engage as an escrow agent for Innovida Inc., the offices of

Charles Ghelman

1025 Ingraham Building 25 SE 2nd Avenue

Miami, FL C33131

Telephone +1-305-579-9160

Osorio undertakes the responsibility of delivering to the escrow agent of all Innovida Inc. original documents including shareholder book and register, by laws, board minutes and resolutions of Innovida Inc and COEG LLP as well as original share certificate of Cayman Convertible Note of Florida.

8.   There are no agreements, warranties, or representations, express or implied, except those expressly set forth in this agreement. All agreements, representations, and warranties contained in this agreement shall apply as of the closing date and shall survive the closing of this agreement.

9   This agreement is to be governed by and construed under the laws of the State of Florida

10. Both parties agree to maintain absolute confidentiality about this agreement.

In witness whereof the parties have executed this agreement in Miami at the day and year first above written.

_____ Claudio Osorio,          Miami 03/08/2007

_____ Engin Yesil, President  Miami   03/08/2007
Core Inc.,

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

## INNOVIDA INC.

TOTAL AUTHORIZED ISSUE
1,000 SHARES PAR VALUE $.01 EACH
COMMON STOCK

See Reverse Side
Certain Definitions

*This is to Certify that* _____ *is the owner of*

_____

*non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

*Witness, the seal of the Corporation and the signatures of its duly authorized officers.*

**Dated**

_____
SECRETARY

_____
PRESIDENT

PLAINTIFF'S
EXHIBIT

**INNOVIDA INC.**

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

TOTAL AUTHORIZED ISSUE
1,000 SHARES PAR VALUE $.01 EACH
COMMON STOCK

This is to Certify that _____ is the owner of

_____ non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated _____

SECRETARY

PRESIDENT

Case 13-01724-RAM Doc 20 Filed 11/27/13 Page 59 of 63

Convertible Note in the amount of $3,912,754.20

May 2nd, 2007 (the "Effective Date")

Innovida Homes, Inc., a Florida corporation (the "Borrower"), for value received, promises to pay to

Core Development Inc,

1080 N.W. 163rd Drive,

Miami, Florida 33139 USA.

or to its order, together with any assignees, jointly or severally, (the "Holder", and together with all of the holders of the Note, the "Holders") on or before, 12-11-07 (the "Maturity Date") (unless this Note shall have been sooner called for redemption or converted as herein provided), the sum of Three Million Nine Hundred Ninety Six Thousand Four Hundred Twenty Six Dollars And Forty Seven Cents, $3,912,754.20) plus accumulated interest. All payments of both principal and interest, if any, shall be made at the address of the Holder hereof as it appears in the books and records of the Borrower, or at such other place as may be designated by the Holder

1. Interest. So long as the Borrower has not defaulted on its obligation to make a payment of the principal owing on this Note when due, interest will accrue on this Note at the rate of Seven percent (7%) per annum. If the Borrower fails to make any payment of principal owing on this Note when due (due to an event of Default or otherwise) interest shall begin to accrue on the unpaid principal of this Note at the rate of Seven percent (7%) per annum (computed on the basis of a three hundred sixty-five (365) day year and the actual days elapsed) from the date such principal is due until paid.

2. Conversion Right

(a) The Holder of this Note shall have the right, at Holder's option, at any time, to convert all, or any part of this Note into such number of fully paid and nonassessable shares of Common Stock as provided herein. The Holder of this Note may exercise the conversion right as giving written notice (the "Conversion Notice") to the Borrower of the exercise of such right and stating the name or names in which the stock certificate(s) for the shares of Common Stock are to be issued and the address to which such certificate, shall be delivered. The Conversion Notice shall be accompanied by this Note. The number of shares of Common Stock into which this Note shall be converted pursuant to this Section 2(a) shall be determined by dividing (x) the then outstanding principal amount of, together with all accrued and unpaid interest on (if any), of this Note (such amount being divided by a number commensurate, an event of a per share value equal to One Dollar ($1). Conversion shall be deemed to have been effected pursuant to this Section 2(a) on the date the Conversion Notice is received

(c) Upon the conversion of this Note pursuant to this Section 2, this Note and all indebtedness represented by this Note shall be deemed cancelled and the Lender shall have no rights with respect to this Note other than the right to receive the shares of Common Stock issuable upon such conversion. Promptly following a conversion effected pursuant to this Section 2, the Borrower shall issue and deliver to Lender against its signed receipt therefore or by United States registered mail, return receipt requested, to the address designated in the Conversion Notice, the securities to which Holder is entitled. No fractional shares will be issued upon the conversion of this Note, but in lieu of such fractional shares the Borrower shall make a cash payment thereto on the basis of the per share price of which the conversion is being effected.

3. Reservation of Shares. The Borrower warrants and agrees that it shall, at all times reserve and keep available sufficient authorized and unissued shares of Common Stock, or treasury shares of Common Stock necessary to effect the conversion of this Note

4. Taxes. The Borrower shall pay any documentary or other transactional taxes attributable to the issuance or delivery of the Note or the shares of Common Stock issued upon conversion for the Holder (excluding any federal, state or local income taxes and any income taxes or taxes imposed upon the Holder for the jurisdiction of any political subdivision thereof, under which such Holder is organized or required to do business.)

5. Default. Any of the following shall be deemed to be an event of default (each an "Event of Default") hereunder: (a) if any current payable here under is not paid when due or "Payment Default") and remains unpaid more than ten (10) days after written notice of default is given to the Borrower; (b) the Borrower files a voluntary petition in bankruptcy or becomes insolvent; (c) if this does petition in bankruptcy against the Borrower is filed and is not dismissed within sixty (60) days of the date of its on file; (d) if a receiver or trustee is appointed for the Borrower; (e) if an assignment shall be made by the Borrower for the benefit



PLAINTIFF'S EXHIBIT



as it was, not realized by Beneficiary against the members of a Trust and is not discussed within sixty (60) days of the date of Bankruptcy or winding up hereto as appointed to it by Borrower, or an assignment shall be made by the Borrower for the benefit of creditors, or any of a default, other than a Payment Default it shall occur in the due observance or performance of any covenant, condition or agreement on the part of the Borrower to be observed or performed pursuant to the terms hereof and such default shall continue unremedied for thirty (30) days after written notice of the default is given to the Borrower. Upon the occurrence of any event of Default, the Holder of the Note may declare all outstanding principal hereunder, together with accrued unpaid interest thereon, immediately due and payable. Any action taken in accordance with the preceding sentence shall be at the Holder's sole discretion exclusive to this Note, or any part hereof be collected at law or in equity or in bankruptcy, receivership or other court proceedings, the Borrower agrees to pay, in addition to principal and interest due and unpaid, all costs of collection, including reasonable attorney fees and expenses incurred by the Holder in collecting or enforcing this Note.

6. Failure to Act and Waiver. No failure or delay by the Holder hereof to require the performance of any term or terms of this Note or not to exercise any right or any remedy shall constitute a waiver of any such term or of any right of any default or shall in any way affect the Holder's right thereafter to enforce any such right, power or remedy at any later time. No waiver of a single breach or default after the Maturity date of the amount payable under this Note, the Holder shall not be deemed to have waived the right either to require prompt payment when due of all other amounts payable, or to later declare a default for failure to effect such payment of this such other amount. The failure of the Holder to give notice of any failure or breach of this Borrower under this Note shall not constitute a waiver of any right or remedy in respect of such continuing failure or breach or any subsequent failure or breach.

7. Governing Law. This Note shall be deemed to be made under and shall be construed in accordance with the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

8. Holder's Right to Request Multiple Notes. The Holder shall, upon written request and presentation of this Note, have the right to request issuance of a this Note in a smaller or greater amount as of such to be in such amounts as shall be requested.

9. Transfer. This Note may be transferred on the books of the Borrower by the registered Holder hereof, or its the Holder's attorney duly authorized in writing, upon delivery to the Borrower of a duly executed assignment of the Note, or part thereof to a proper form. Upon registration of such Note or part thereof and its delivery to a replacement Note or Notes in such amount of the new Holder.

The Borrower shall be entitled to treat any holder of record of this Note as the Holder in fact thereof and of the Note and shall not be bound to take note of any equity or other claim to or interest in this Note in the name of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by applicable law.

10. Optional Prepayment. The Borrower shall be entitled, at its option upon thirty (30) days prior written notice to repay in cash a portion or all of the outstanding principal amount together with interest due thereon, penalties and all other amounts due thereunder; provided, further, however, that the Holder shall have the right but not the obligation during such thirty (30) day notice period thereunder to elect to receive prepayment in lieu of this Note together with all accrued but unpaid interest thereunder such date in shares of Common Stock pursuant to the terms of Section 5 exchange.

11. Notices. All notices and communications under this Note shall be in writing and shall be either delivered in person or sent by first-class registered or certified mail and be computed by a signed receipt therefore or mailed first-class United States certified or airmail return receipt of postage, prepaid and addressed as follows: if to the Borrower at its principal office address and to the Holder. The Note to the address last of such Holder as it appears on the books of the Borrower or to such other address and applicable designated by said Holders. Any notice of communication shall be deemed given and received as of the date of such delivery if delivered in person or, if mailed, then three (3) days after the date of mailing.

12. Severability. That invalidity of any of the provisions of this Note shall not invalidate or otherwise affect any of the other provisions of this Note which shall remain in full force and effect.

13. Entire Agreement and Amendments. This Note represents the entire agreement between the parties hereto with respect to the subject matter in and and there are no representations or warranties or agreements except as set forth herein. This Note may not be amended or modified in any manner except by a document signed by the Holder.

14. Counterparts. This Note may be executed in multiple counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

In witness whereof, the undersigned has caused this Note to be duly issued, executed and delivered on the Effective Date

Oceanica Holdings, Inc.

_____
Claudio Osorio
Chairman

_____
Engin Yesil
Vice-Chairman



INNOVIDA STRUCTURE

Core Development Holdings Corporation (Florida)

30%

Innovida, Inc (Delaware)

100%

50% (Callable Convertible Bonds)

Innovida Holdings, Inc (Florida)

25%

COEG LLP (Florida)

100%

Innovida Holdings, Inc (Cayman Islands)

51%

Innores GmbH (Germany)



PLAINTIFF'S EXHIBIT
D

OSORIO-0002



InnoVida Holdings LLC Structure July 1, 2010

PLAINTIFF'S EXHIBIT

OSORIO-0003